IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CYNTHIA BRYANT,
     Petitioner,

vs.                        Case No.:  4:17cv427/WS/EMT

MARK S. INCH,[1]
     Respondent.
_____/

## ORDER and REPORT AND RECOMMENDATION

     This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 25).  Petitioner filed a reply (ECF No. 27).

     The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues presented by the parties, it is

_____

[1] Mark S. Inch succeeded Julie Jones as Secretary for the Department of Corrections, and is automatically substituted as Respondent.  *See* Fed. R. Civ. P. 25(d).

the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases. It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 25).[2] On June 7, 2013, Petitioner was indicted in the Circuit Court in and for Leon County, Florida, Case No. 2013-CF-1757, with one count of capital first degree premeditated murder (Ex. B1 at 6–7). On January 21, 2014, Petitioner filed, in open court, a waiver of her right to a twelve-peson jury, in exchange for the State's agreement not to seek the death penalty (*see id.* at 44). On March 31, 2014, Petitioner entered a written plea agreement pursuant to which she agreed to enter a no contest plea to a reduced charge of second degree murder (a life felony) in exchange for a sentence of forty-five (45) years in prison with credit for 310 days (*id.* at 54–55). The same day, the court held a plea and sentencing hearing (*id.* at 83–97). The court conducted a colloquy, and found that Petitioner

---

[2] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 25). If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Case 4:17-cv-00427-WS-EMT    Document 28    Filed 06/06/19    Page 3 of 55

Page 3 of 55

understood the nature of the charges against her and the consequences of her plea; that her decision to enter a plea was made freely and voluntarily; and that she was advised by a competent attorney (*id.* at 86–91). The trial court further found that there was a sufficient factual basis for the plea (*id.* at 91). The court accepted Petitioner's plea, adjudicated her guilty of second degree murder, and sentenced her in accordance with the plea agreement (*id.* at 56–64, 96).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D14-1622 (Ex. B2). Petitioner's counsel filed a brief, pursuant to *Anders v. California*, 386 U.S. 738 (1967), asserting that counsel was unable to make a good faith argument that reversible error occurred in the trial court (*id.*). The First DCA provided Petitioner an opportunity to file a pro se initial brief (Ex. B3), but she did not do so. The First DCA affirmed the judgment per curiam without written opinion on December 18, 2014 (Ex. B4). *Bryant-Penny v. State*, 152 So. 3d 571 (Fla. 1st DCA 2014) (Table). The mandate issued January 13, 2015 (Ex. B5).

On March 6, 2015, Petitioner filed a motion for post-conviction relief and supporting memorandum in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. C1 at 1–14). On February 19, 2015, the state circuit court dismissed Ground One as legally insufficient, without prejudice to

Case No.:  4:17cv427/WS/EMT

Petitioner's amending the claim within sixty days (*id.* at 15).  Petitioner filed a timely amendment to Ground One (*id.* at 16–19).  On December 3, 2015, the state circuit court entered an order summarily denying Grounds One, Two, and Four, and setting an evidentiary hearing on Ground Three (*id.* at 21–38).  At the conclusion of the evidentiary hearing, the court orally pronounced its denial of Ground Three (*id.* at 45–77).  On February 23, 2016, the court issued a final order denying the Rule 3.850 motion (*id.* at 39).  Petitioner appealed the decision to the First DCA, Case No. 1D16-1369 (Ex. C2).  The First DCA affirmed the lower court's decision per curiam without written opinion on March 30, 2017 (Ex. C4).  *Bryant v. State*, 224 So. 3d 211 (Fla. 1st DCA 2017) (Table).  The mandate issued April 25, 2017 (Ex. C5).

Petitioner filed the instant federal habeas action on September 7, 2017 (ECF No. 1).

II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254.  Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> **(1)**  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> **(2)**    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538

U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue.  *Thaler v. Haynes*, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Woods v. Donald*, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).  Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  *See Woods*, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants:  "Because none of our cases confront the specific question presented by this case, the state court's

decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).   If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim.   *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.   The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam).   In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.   Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g.*, *Miller-El*, 537 U.S. at 340 (explaining that

a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"). Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *See Cave v. Sec'y for Dep't of Corr.*, 638 F.3d. 739 (11th Cir. 2011). However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claim. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Case No.: 4:17cv427/WS/EMT

## III.    EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner exhaust available state court remedies, *see* 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  *Duncan*, 513 U.S. at 365–66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); *Picard*, 404 U.S. at 277–78.

The Supreme Court has provided lower courts with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In *Picard v. Connor*, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected

the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner makes a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. *Anderson v. Harless*, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982). In *Anderson*, the Sixth Circuit Court of Appeals granted the habeas petition on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. 459 U.S. at 7 (citing *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." *Anderson*, 459 U.S. at 7. On review by the Supreme Court, the Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. *Id.*, 459 U.S. at 7 and n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record

satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in *Duncan v. Henry*, 513 U.S. 364. The *Duncan* Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[3] The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." *Duncan*, 513 U.S. at 365–66.

In *Baldwin v. Reese*, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." 541

---

[3] The petitioner in *Duncan* raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal. 513 U.S. at 366.

U.S. 27, 32, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004). The *Baldwin* court commented that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.*, 541 U.S. at 32. With regard to this language, the Eleventh Circuit explained in *McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" *McNair* [*v. Campbell*], 315 F. Supp. 2d at 1184 (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[4]

---

[4] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. *See Bailey v. Nagle*, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See Coleman v. Thompson*, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. *Bailey*,

---

petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id*.

172 F.3d at 1303.  In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar.  *Id.*

A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question.  *See Harris v. Reed*, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  *Lee v. Kemna*, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The federal court "lacks jurisdiction to entertain a federal claim on review of a state court judgment, if that judgment rests on a state law ground that is both independent of the merits of the federal claim and an adequate basis for the court's decision."  *Foster v. Chatman*, — U.S. —, 136 S. Ct. 1737, 1745, 195 L. Ed. 2d 1 (2016) (internal quotation marks and citation omitted).  Even where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim.  *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) (citing *Harris*, 489 U.S. at 264 n.10).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of

decision. *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim. Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. *Id.* Third, the state procedural rule must be adequate. *Id.* The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. *Id.*

To overcome a procedural default, the petitioner must show cause for the default and prejudice resulting therefrom, or that the federal court's failure to reach the merits of the claim would result in a fundamental miscarriage of justice. *Tower*, 7 F.3d at 210; *Parker*, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)). To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d

808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.* Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 399, 133 S. Ct. 1924, 185 L. Ed. 2d 1019 (2013). As the Court stated in *Schlup*, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]." 513 U.S. at 332; *see also House v. Bell*, 547 U.S. 518, 537, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).

Within this framework, the court will review Petitioner's claims.

## IV.    PETITIONER'S CLAIMS

A.    <u>Ground One:  "Petitioner's constitutional amendment right [sic] was violated where counsel failed to move for a continuance in order to determine Pet[itioner's] mental state."</u>

> **Ground Three:** "Counsel was ineffective for failing to inform, investigate, and/or prepare defense [of] insanity, mental incompetence, thus denying her 6th U.S. Constitutional right." [5]

In Ground One, Petitioner alleges that at the beginning of the plea proceeding, the court "discussed the Defendant's struggle to stabalize [sic] her medication" (ECF No. 1 at 5). [6]  Petitioner alleges she had not been taking her medication for some time (*id.*).  Petitioner alleges the court asked her if she had taken any medication, and she responded that she was not taking any medication (*id.*).  Petitioner alleges this was "a clear indication of the Defendant's mental incompetence and failure to understand simply asked questions" (*id.*).  Petitioner contends defense counsel should have requested a continuance of the plea hearing to permit her to be evaluated for mental competence (*see* ECF No. 27 at 2).

In Ground Three, Petitioner alleges she is diagnosed with schizophrenia and bipolar disorder, which causes separation of thought process and emotion, disorientation of reality accompanied by delusion and hallucination, fragmentation

---

[5] For organizational purposes, the court is consolidating its discussion of Petitioner's four claims into two groups.

[6] When referencing the parties' pleadings, the court refers to the page numbers automatically assigned by the court's electronic filing system, rather than the page numbers of the original documents.

of the personality, motor disturbances, and bizarre behavior (ECF No. 1 at 8).

Petitioner alleges both of her mental disorders are extremely severe (*id.*). She alleges

defense counsel failed to inform her that her mental disorders were a viable defense

to the murder charge (*id.*).

Respondent asserts Ground One is essentially the same claim Petitioner

presented to the state courts as Amended Ground One of her Rule 3.850 motion, and

it thus "appears" to be exhausted (ECF No. 25 at 7, 21–22). Respondent contends

the state court's adjudication Ground One was not contrary to or an unreasonable

application of clearly established federal law (*id.* at 22–27).

With respect to Ground Three, Respondent contends this claim of ineffective

assistance of trial counsel ("IATC") is ***similar*** to the IATC claim presented as

Ground Three in Petitioner's Rule 3.850 motion, but the claims are dissimilar in that

Petitioner did not cite the Sixth Amendment in her Rule 3.850 motion (ECF No. 25

at 9–11) (emphasis in original). Respondent further contends Petitioner's citation to

a Florida state case, which in turn cited *Strickland v. Washington*, 466 U.S. 668, 104

S. Ct. 2052, 80 L. Ed. 2d 674 (1984), was insufficient to fairly present her federal

claim to the state courts (*id.*). Respondent contends Ground Three is thus

unexhausted and procedurally defaulted (*id.*). Respondent argues even assuming

Ground Three was not procedurally defaulted, Petitioner is not entitled to federal

habeas relief, because the state court adjudicated the merits of the claim, and the court's adjudication was not contrary to or an unreasonable application of clearly established federal law (*id.* at 34–41).

In Petitioner's reply, she argues she fairly presented Ground Three as a federal claim in state court by arguing that her claim was a claim of ineffective assistance of counsel, even though she did not expressly cite the Sixth Amendment in her argument of Ground Three (ECF No. 27 at 2).

The court will first address Respondent's exhaustion defense as to Ground Three.  The state court record shows that Petitioner's Rule 3.850 motion presented four IATC claims (Ex. C1 at 1–7).  Petitioner argued counsel's conduct was deficient, and it prejudiced the outcome of her case (*id.*).  In Petitioner's Amended Ground One, she cited *Strickland*, and in her argument of Ground Two, she contended counsel's ineffective assistance violated her Sixth Amendment right (*id.* at 3, 17).  Petitioner did not mention federal law in her arguments of Grounds Three and Four (*see id.* at 4–6).  In the state court's written order denying three of Petitioner's four IATC claims (Grounds One, Two, and Four), the court cited *Strickland* as the applicable legal standard (*id.* at 21).  On appeal to the First DCA, Petitioner abandoned two IATC claims (Grounds Two and Four), but with respect

to Grounds One and Three, she argued that the lower court's adjudication of those claims was erroneous under *Strickland* (Ex. C2 at 6–7).

The undersigned concludes that Petitioner alerted the state circuit court to the federal nature of all of her IATC claims, and she alerted the First DCA to the federal nature of those IATC claims she was appealing. Further, the state courts adjudicated the merits of the federal claims which Petitioner presented. Therefore, Petitioner satisfied the exhaustion requirement as to Grounds One and Three. The court will thus proceed with the next step of determining whether Petitioner has demonstrated that the last state court's adjudication of the merits of Grounds One and Three (in this case, it is the First DCA's decision in the post-conviction appeal) was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of clearly established federal law.

> 1.    Clearly Established Federal Law

The two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) applies to claims that counsel was ineffective during the plea process. *See Lafler v. Cooper*, 566 U.S. 156, 162-63, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012) (applying *Strickland*'s two-part test to federal habeas petitioner's claim that counsel was ineffective for advising him to reject a plea offer); *Missouri v. Frye*, 566 U.S. 133, 145, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012)

(applying *Strickland*'s two-part test to federal habeas petitioner's claim that counsel was ineffective for failing to communicate a prosecution plea offer before it lapsed); *Hill v. Lockhart*, 474 U.S. 52, 48, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985) (applying *Strickland*'s two-part test to defendant's challenge to his guilty plea based on ineffective assistance of counsel). *Strickland*'s first prong requires a defendant to show "'that counsel's representation fell below an objective standard of reasonableness.'" *Hill*, 474 U.S. at 57 (quoting *Strickland*, 466 U.S. at 688). The focus of inquiry under the performance prong of the *Strickland* standard is whether counsel's assistance was "reasonable considering all the circumstances." *Strickland*, 466 U.S. at 691. *Strickland*'s second prong requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In the context of pleas, "[t]he . . . 'prejudice' requirement . . . focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, 474 U.S. at 59.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *See Strickland*, 466 U.S. at 698; *Collier v. Turpin*,

177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland*'s high bar is never

an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed.

2d 284 (2010). "Establishing that a state court's application of *Strickland* was

unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105.

As the court explained in *Richter*:

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S. at 689–690, 104 S. Ct. 2052. Even under de novo review, the standard for judging counsel's representation is a most deferential one.
>
> . . . .
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333 n.7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S. [111,] 123, 129 S. Ct. [1411,] 1420[, 173 L. Ed. 2d 251 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 123, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.

The Due Process Clause of the Fourteenth Amendment prohibits states from trying or convicting a defendant who is mentally incompetent. *See Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966). The Supreme Court set the standard to be used in determining mental competency as whether a defendant "has sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding—and whether he [or she] has a rational as well as factual understanding of the proceedings against him [or her]." *Dusky v. United States*, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (per curiam); *Drope v. Missouri*, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); *see also Indiana v. Edwards*, 554 U.S. 164, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008).

In *Drope*, the Court elaborated as follows:

> The import of our decision in *Pate v. Robinson* is that evidence of a defendant's irrational behavior, his [or her] demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

*Drope*, 420 U.S. at 180.

The Eleventh Circuit has applied and expounded upon these standards. "[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995) (citation omitted). A *Pate* analysis must focus on "what the trial court did in light of what it then knew, [and] whether objective facts known to the trial court were sufficient to raise a bona fide doubt as to the defendant's competency." *Fallada v. Dugger*, 819 F.2d 1564, 1568 (11th Cir. 1987) (citations omitted). A petitioner who makes a substantive competency claim, contending that she was convicted while mentally incompetent, "is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence." *James v. Singletary*, 957 F.2d 1562, 1571 (11th Cir. 1992). This standard is in contrast to a petitioner who makes a procedural competency claim alleging that the trial court failed to hold a competency hearing after her competency was put at issue. To prevail on a procedural competency claim, "a petitioner must establish that the state trial judge ignored facts raising a 'bona fide doubt' regarding the petitioner's competency to stand trial." *Id.* at 1572 n.15 (citing *Fallada*, 819 F.2d at 1568). A petitioner who presents "clear and convincing evidence" which creates a "real, substantial and legitimate doubt" as to her competence is entitled to an evidentiary hearing on her substantive competency

claim. *Medina*, 59 F.3d at 1106 (quoting *James*, 957 F.2d at 1573). However, the standard of proof is high, and "the facts must positively, unequivocally, and clearly generate the legitimate doubt." *Card v. Singletary*, 981 F.2d 481, 484 (11th Cir. 1992) (quotations omitted). Relevant information may include evidence of a defendant's irrational behavior, demeanor at trial, or prior medical opinion. *See Watts v. Singletary*, 87 F.3d 1282, 1287 (11th Cir. 1996).

A lifelong history of mental illness and emotional problems does not demonstrate incompetency without a specific showing of how these difficulties generated a substantial doubt as to the defendant's competency at the time in question. *See Medina*, 59 F.3d at 1106; *Card, supra*. Similarly, the fact that the accused is undergoing treatment with psychiatric drugs, while relevant, does not alone prove incompetence. *See Sheley v. Singletary*, 955 F.2d 1434, 1438–39 (11th Cir. 1992). In order to establish incompetence, evidence must establish that the drugs affected the accused to the point that she could not effectively consult with her attorney and could not understand the proceedings. *See id.* at 1439.

2.    Federal Review of State Court Decision

a.    <u>Ground One</u>

With respect to Ground One, trial counsel's failure to request a continuance of the plea hearing in order to have Petitioner mentally evaluated, the only fact

Petitioner alleged in support of this claim was that her stating "No," when the trial court asked her if she was currently under the influence of any medication, should have indicated to counsel and the court that she was incompetent to proceed (*see* Ex. C1 at 17). Petitioner alleged:

> Counsel, knowledge [sic] of Defendant's diagnosis of schizophrenia and severe bi-polar disorder, and his open discussion at plea hearing with Judge about her mental instability and the jail's struggle to medicate her correctly shows he cannot claim ignorance of her condition. Defendant shows a lack of understanding and easy confusion over a simple question. At this time, counsel should have requested the Court to reschedule the hearing until he set up further evaluation for Defendant's competency and his failure to do so meets the deficiency prong for ineffective assistance of counsel. This is counsel's specific act of omission, by letting proceedings continue after witnessing Defendant's incompetency. Someone who does not even know they are taking medications until they are told so is clearly incompetent.

(Ex. C1 at 17).

The state circuit court adjudicated Ground One as follows:

> Defendant now brings four grounds alleging ineffective assistance of counsel. To prevail on these claims, Defendant must establish that counsel's performance was both deficient and prejudicial. *See Spera v. State*, 971 So. 2d 754, 757 (Fla. 2007) (outlining standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984)). Based on this legal framework, the Court will analyze Defendant's claims.

> Ground One

> Defendant claims that counsel should have requested that the hearing be continued because she originally answered no to the Court's

question of whether she was under the influence of alcohol, drugs, or medication. The remainder of the colloquy regarding Defendant's mental state refutes this claim. Under oath Defendant affirmed her attorney's explanation to the Court that she was clear headed and had her medications well adjusted. *Exh. 1 – pp. 4–5.* As such, there was no basis for counsel to seek a continuance. Defendant cannot go behind her statements made under oath and the plea hearing. *Davis v. State*, 938 So. 2d 555, 557 (Fla. 1st DCA 2006). This claim is denied.

(Ex. C1 at 21–22).

The transcript of Petitioner's plea colloquy is part of the state court record.

Contrary to Petitioner's assertions, her statements during the colloquy did not

indicate she was incompetent.

MR. CUMMINGS [defense counsel]:  . . . At this time, Ms. Bryant is prepared to withdraw her previously entered written pleas, tender to the court a plea of no contest as charged to second degree murder. The State has agreed to waive the PRR [Prison Releasee Reoffender enhancement].

The agreement is for 45 years Department of Corrections, credit for 310 days served, whatever the court costs are, and I believe a PD fee of $100.

THE COURT: . . . Is that your understanding of what you're doing, Ms. Bryant?

THE DEFENDANT: Yes, sir.

. . . .

THE COURT: Would you swear the defendant, please?

(DEFENDANT SWORN)

THE COURT: State your name for the record, please.

THE DEFENDANT:  Cynthia Bryant.

THE COURT:  And, Ms. Bryant, are you currently under the influence of any alcohol, drug, or medication?

THE DEFENDANT:  No.

THE COURT:  It was my understanding you are taking some medications.

THE DEFENDANT:  I took the medication this morning.

THE COURT:  All right.  Well, that's what we're trying to discuss.  Have you taken anything other than what's been prescribed for you by a doctor?

THE DEFENDANT:  No, sir.

THE COURT:  Is that medication interfering with your ability to understand what's going on here today?

THE DEFENDANT:  No.

THE COURT:  You're taking the medication to assist you in understanding what's going on is my understanding.  Is that correct?

THE DEFENDANT:  What you say [sic]?

THE COURT:  The medication is to assist you with your understanding what's going on, right?
. . . .
THE DEFENDANT:  Yes.

THE COURT:  Mr. Cummings, have you had enough time to talk to her and are you comfortable that she's clear-headed to proceed here today?

MR. CUMMINGS:  Yes, Judge.  For the past many months, she has been doing very well.  There was a time at the jail when her medication was not adjusted properly, there were some issues.  I think she is doing extremely well the past many months we've been talking.  And Ms. Bryant has indicated that to me also.

THE COURT:  Is that correct, Ms. Bryant?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right. Now, the agreement is that you would plead to second degree murder.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  In reference to that charge, there's some rights that you're giving up.  I want to make sure that you understand the rights that you're giving up.

You are giving up the right to have a trial by a jury.  You're giving up the right to remain silent.  You're giving up the right to confront the witnesses against you.  You're giving up the right to compel the attendance of witnesses on your own behalf.

You're giving up the right to persist in your present plea of not guilty.  You do have a right to make the State prove your guilt to a jury beyond a reasonable doubt.  But if I accept your plea, you are giving up each of those rights.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  You have a right to be represented by an attorney at all stages of these proceedings.  However, if I accept your plea of no contest, then you waive or give up that right also.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  You have a right to appeal anything relating to the judgment and sentence normally.  However, upon accepting your plea of no contest, you waive the right to appeal anything except as to the legality of the sentence.

I'm going to impose the sentence that's been agreed upon by the attorneys.  It is a legal sentence.  So, essentially, you're giving up all appeal rights.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  I also need to advise you that if you are not a U.S. citizen, this plea could result in your deportation from the United States. Do you understand that?

THE DEFENDANT:  Yes.

. . . .

THE COURT:  Upon your plea of no contest being accepted here today, there will not be a trial of any kind in your case.  The next thing we're going to do is go on to sentencing.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Can the State give me a factual basis, please?

MS. CAPPLEMAN [the prosecutor]:  Yes, sir.  On or about May 25th of 2013, the defendant was residing at 2125 Pasco Street with the victim, Reginald Baldwin.  It was Mr. Baldwin's birthday.  He was outside preparing to grill some meat, have a party for his birthday, and got involved in a verbal altercation with the defendant, who then went inside, got a knife, came back outside and stabbed Mr. Baldwin one time in the neck, causing massive bleeding and his death.

THE COURT:  Do you understand, Ms. Bryant, if this matter went to trial, those are the allegations that the State would be making against you?

THE DEFENDANT: Yes.

THE COURT:  And do you plead no contest to one count of second degree murder?

THE DEFENDANT:  Yes.

THE COURT:  And do you enter into that plea because you believe it to be in your best interest?

THE DEFENDANT:  Yes.

THE COURT:  The maximum penalty for this offense is life in prison.  Do you understand that maximum penalty?

THE DEFENDANT:  Yes.

THE COURT:  I've been provided by Mr. Cummings with a written Plea and Acknowledgment of Rights Form.  Did you sign that?

THE DEFENDANT:  Yes.

THE COURT:  And did you go over that with Mr. Cummings?

THE DEFENDANT:  Yes.

THE COURT:  Has he answered any questions you had about the rights you're giving up and the agreement you've entered into?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any questions of me about either of those things?

THE DEFENDANT:  No.

THE COURT:  The agreement calls for you to be allowed to plead to this reduced sentence, second degree murder, you would be adjudicated guilty, sentenced to 45 years in prison, be given credit for 310 days served.

. . . .

The State has agreed to waive a claim that you qualify as a Prison Releasee Reoffender.

Do you understand that's the agreement you've entered into?

THE DEFENDANT:  Yes.

. . . .

THE COURT:  Anybody threatened you in any way to get you to enter this plea?

THE DEFENDANT:  No.

THE COURT:  Anybody promised you anything other than what we've said here to get you to enter this plea?

THE DEFENDANT:  No.

THE COURT:  Do you enter into this plea freely and voluntarily?

THE DEFENDANT:  Yes.

THE COURT:  Do you wish me to accept the plea that you've tendered here to the Court?

. . . .

THE DEFENDANT:  Yes.

THE COURT:  All right.  The court finds you understand the nature of the charges against you and appreciate the consequences of this plea.  I find that the facts the State is prepared to prove are sufficient to sustain your plea.

I further find your decision to plead no contest is freely and voluntarily made, that you've had the advice and counsel of a competent attorney.

(Ex. C1 at 26–33).   The court heard statements from the victim's sister and the victim's ex-wife, who was also the mother of a son they shared (*id.* at 33–36).   The court proceeded:

THE COURT:  All right. Anything else from the defense, Mr. Cummings?

MR. CUMMINGS:  No, sir.

THE DEFENDANT:  I want to apologize to the family.

THE COURT:  I'm not sure they could hear you say that, Ms. Bryant.

THE DEFENDANT:  Well, I apologize to the family.  Reggie, I lived with him, too.  There was a part of him y'all didn't see.  He was abusive.  He abused me.

THE COURT:  Ma'am.

MR. CUMMINGS:  But there was no intent, you did not want this to happen?

THE DEFENDANT:  No.

THE COURT:  I'm disappointed you did that, Ms. Bryant.  I guess you're here not by accident.

I apologize.  I did not mean for that to happen here today to y'all. I understand your loss . . . .

(Ex. C1 at 36–37).

Petitioner presented argument on Ground One on appeal to the First DCA (Ex. C2). The First DCA affirmed the circuit court's decision without written opinion (Ex. C4).

In *Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188 (2018), the Supreme Court held that where there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment or rejecting the same claim, federal habeas courts employ a "look through" presumption. The *Wilson* Court described this presumption as follows:

> We hold that the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Id.* at 1192.

Based upon the colloquy, the state court reasonably concluded that Petitioner failed to show that Attorney Cummings (or the trial court, for that matter) was aware of facts sufficient to raise a bona fide doubt as to Petitioner's competency at the time of the plea. Further, Petitioner proffered no evidence to support her speculative

assertion that if Attorney Cummings had requested a continuance to investigate her competency, there is a reasonable probability an expert would have determined she was incompetent to proceed. *See Lawrence v. Sec'y, Fla. Dep't of Corr.*, 700 F.3d 464, 479 (11th Cir. 2012) (holding that in order to establish *Strickland* prejudice based upon counsel's failure to request a competency hearing, a petitioner must show that "there was a reasonable probability that he would have received a competency hearing and been found incompetent had counsel requested the hearing."). The state court's adjudication of Ground One was not contrary to or an unreasonable application of *Strickland*.

> b.    Ground Three

With respect to Ground Three, the state circuit court held an evidentiary hearing and heard testimony from Petitioner, a witness on Petitioner's behalf, and Attorney Gregory Cummings, Petitioner's trial counsel. Petitioner testified as follows:

> THE COURT: Tell me what you'd like me to know about your claim of ineffective assistance for not telling you about a viable insanity defense.
>
> MS. BRYANT: Well, I don't know. I was in an abusive relationship.
> . . . .
> And I couldn't beat the man. I didn't try to kill him, but I know I stabbed him. But before I did that, I had—was cutting onions up on

the grill and chicken and stuff, and that's when the commotion started. Yeah. That's when all the commotion started. And it was on his birthday.

And everybody was telling—we had been arguing, but it seemed like we had talked and calmed down. But we had been arguing all that week.

So on his birthday, we had some words, and I say, I'm just gonna [sic] leave, and he said no.

So he said something about me, calling me all kind of B-I-T-C-Hs [sic] and stuff like that. And his men friends tell him don't do it. He shouldn't do that. And I had spent some money on—to get him a birthday present—party.

So he said I was his B-I-T-C-H and don't nobody tell him who to talk to or none of that.

So he came over where I was. I said, "Well, your mama and your sister and your daughter, if you got one, is your B-I-T-C-H."

And that's when he picked me up and hold me up [sic], and I was kicking. And when he put me down, I just—not realizing still that I had the knife in my hand. And I poked him, and when I seen [sic] the blood, I got real scared.

But I didn't try to kill him. And I wasn't on my medication at the time, so . . . .

(Ex. C1 at 45–47). Petitioner testified she knew what she did, but it was an accident (*id.* at 50). She testified, "I didn't stab him because I wanted to. He was beating me up. It was an accident" (*id.* at 50–51).

Petitioner testified she was supposed to be taking Risperdal, Celexa, and Cogentin, but she was not taking them at the time of the offense (Ex. C1 at 49). Petitioner testified that when she doesn't take her medication, "things don't go right," and she "overreacts" (*id.*).  Petitioner testified she did not have an opinion from a psychologist, psychiatrist, or any other mental health expert regarding her sanity at the time of the offense, but she wished to present testimony from her former mental health "counselor," Beth Deez (*id.*).

Ms. Deez testified she worked with Petitioner for approximately five years when she (Deez) was a "recovery support navigator" or "peer specialist" for a nonprofit organization called Ability First (Ex. C1 at 54–55).  With respect to her education and training in mental health, Ms. Deez testified she was certified by the State of Florida as a recovery support navigator (*id.*).  She testified she did not have a psychiatry background and was not a therapist (*id.*).  She testified she was trained in "understanding basic psychiatric issues" and "how to listen, encourage, support" (*id.*).  Ms. Deez testified she and Petitioner had "lost touch" prior to the offense (*id.*). She testified that Petitioner's attorney contacted her in July of 2013, and told her that Petitioner had asked to see her (*id.* at 56).  Ms. Deez testified she visited Petitioner approximately one week later, and "I could tell that she was off her meds" (*id.*). Deez testified that Petitioner told her she was not taking her medication at the time

of the offense, because she ran out of money (*id.* at 57).  Ms. Deez testified she told Petitioner she should have contacted Ability First, because the organization purchased medications for clients (*id.*).  With respect to Petitioner's plea, Ms. Deez testified Petitioner "was so scared and so confused, she was merely doing what the lawyer told her to do" (*id.* at 59).

On cross-examination, Ms. Deez testified that during the time she worked with Petitioner, she was not aware of Petitioner's crack cocaine use (Ex. C1 at 60–61).  Ms. Deez testified that her last contact with Petitioner was approximately a month and a half prior to the offense, and "Everything seemed to be okay" (*id.* at 61).

Attorney Cummings testified he had been practicing law since 1980 (he represented Petitioner in 2013–14), and 99.9% of his practice was criminal defense (Ex. C1 at 64–65).  Regarding the issues of Petitioner's competency and sanity, Attorney Cummings testified as follows:

> Q [by counsel for the State].   [D]id you have Ms. Bryant evaluated for competency?
>
> A.  She had seen a doctor appointed by the Public Defender's Office before I got appointed to the case.
>
> Q.  And was found to be competent?
>
> A.  And I can't think of her name right now.

Q.  Spoerl?

A.  I believe so.  There was initially an issue of competency when I first met with—well, when I first met with her, she wanted to tell me the story, and I remember the story that she told me, and having had the discovery, and it didn't match with the discovery, her story, and having read about her prior history mental health issues, I guess I was somewhat suspect of her story and what she was telling me.

I am not easily convinced when my clients tell me certain things that the physical evidence doesn't seem to match with.  I am pretty much realistic with them.  It took several meetings with Ms. Bryant before I expressed my concern that she was wasn't telling the truth.

I believed she was competent.  I never talked to a doctor that said she wasn't or was.

. . . .

I know she had anxiety issues and stuff like that.  She would cry in front of me and—

Q.  But she came to you having been declared competent, and you never developed any cause to believe that that status had changed?

A.  No.  And the reason—it took a while, but Ms. Bryant and I sort of had it out, and I said nobody's gonna believe what you're telling—the story you're telling.  I mean—

Q.  And is the story you're referencing kind of a self-defense theory?

A.  Yeah.  It was a self-defense about she had been jacked up by the victim, and she happened to be already there with—cutting onions with the knife, when there was other witnesses that said she went away from the victim, up into the apartment, which I believe was on the second floor, got the knife, was making comments about what she was going to do.

There were two witnesses.  One—might have even been three witnesses.  One was actually her son who was a witness against her that contradicted what she was telling everybody.  She made an effort to hide the knife.  She made an effort to hide herself.  She . . .

Yes.  The evidence contradicted what she was telling me, and she did say at one point, "I blacked out.  Mr. Cummings, I wasn't taking my medication.  I didn't know that, what [sic] I was doing."

When it got down to it, she was drinking and smoking that day.

Q.  Smoking what?

A.  Well, I've heard from the neighbor it was crack and from her it was marijuana.  Actually two neighbors said she would smoke crack regularly.  Actually, both the victim and her [sic] would and drink. They had both been drinking that day.

And eventually I just confronted her, and the tears came as they had on several occasions.

Q.  Okay.  So you discussed with her the problems with her self-defense—
. . . .

A.  —and if there was any chance of an insanity defense, that would have been wonderful to help her.  I mean, she's a woman who clearly needs some help.

Q.  You mentioned that you were familiar with her mental health issues.  What materials did you review, or what was available to you in reference to the mental health history?

A.  I don't recall it specifically.  The PD's office had provided all their investigative discovery to me.  There was I want to say a niece that had written letters on behalf of Ms. Bryant while she was in jail that had tried to explain some of it to her [Petitioner's initial public

defender]. I never did talk with the niece personally, but some of the letters said she had issues.

. . . .

But as to those letters, I remember talking to Ms. Bryant. "Ms. Bryant, you're telling your niece the story that you're that [sic] you want people to believe that doesn't fit the facts. You know, if you tell people the truth about what's happening, then maybe they can help you."

. . . .

Eventually we got to a point where she said, "Mr. Cummings, I'm just scared. I'm just trying to, you know, to do what I could to help myself basically."

Q. Okay. Did you believe or have evidence to believe that she was insane at the time of the offense?

A. No.

Q. Okay. So the mental health issues or mental health history that you reviewed, anywhere in that history was she ever declared to be insane—

A. I don't recall.

Q. —or had a diagnosis that you think would lend itself to a credible insanity defense in this case?

A. I don't recall it. If I didn't seek it, I don't believe I saw it.

Q. Okay. Well, do you know for sure that you discussed the possibility of an insanity defense with the defendant?

A. I know we talked about defenses, and the only way I thought we could get her out of it would be certain defenses, and I don't— whatever they were at the time. I don't specifically remember talking about being incompetent at the time of the offense, discussing it with her. I don't.

. . . .

But that doesn't mean it wasn't—it didn't go through my mind as a defense that wasn't a viable defense.

Q.  She did—I assume in preparation for the trial, you would have reviewed the reports as well as her police interview?

A.  Yeah.  She was on the video.  Yes.

. . . .

Q.  And she said on the video that she was bipolar and schizophrenic and hears voices, and then was observed in certain times in the video to be talking to herself.  Did you review all of that?

A.  I remember her talking to herself on the video, and I did review all that.  Yes.

Q.  Okay.  And so you would have taken into consideration that evidence when making a determination whether or not to present an insanity defense?

A.  Yes.  And that's—that's what I basically confronted her with.  And what it amounted to was she was fabricating some of this stuff to try to help herself out.

. . . .

That's what it got down to.

Q.  Okay.  And you didn't feel an insanity defense was viable in this case; is that correct?

A.  I did not.

Q.  Why not?

A.  Maybe just because of my experience, the facts that I—as were presented to me from police reports and witnesses, interviews by investigator of witnesses outside of police custody and stuff that told us what they observed in talking to her.

Q.  Okay.  And you actually were ready to proceed to trial in this case because I believe she pled at jury selection; right?

A.  She did.  She—we were ready to proceed.  There was no defense of insanity planned at that.

Q.  Okay.  So was it going to be a self-defense or just a lack of evidence, or what was the plan?

A.  I don't recall.  I—from my point of view now, I'm not sure what it would have been.

Q.  Okay.  And do you recall Ms. Bryant at the table, the defense table, while we were waiting, I think, to pick a jury, begging to take the plea?

A.  Yes.

Q.  Could you tell us about that?

A.  Well, she got really, really scared.  She, on more than one occasion in the jail, would get really, really scared and start crying.  And I can understand her fear.  She had been to prison before; so she knew what to expect, and it got to a point where she wanted me to come and talk to you and just to see if there was a chance that she wouldn't spend the rest of her life in prison.
. . . .
Well, I didn't think 40 years was such as [sic] great deal.  I think you offered 50 to begin with and then 40.  And I truly don't believe that was—

Q.  45 I think is what we ultimately settled on.

A.  You know, it was like why bother with 45.  But she said she'll be such and such an age when she gets out.  That her—either her mother or father lived a long time.  She expected to live a long time, and she would still have a chance to get out.

I personally don't understand taking a plea for 45 years when she was the age she was. I think she would be like 80-something years old or 70s when she gets out, but . . .

Q. So you didn't encourage her to take the plea?

A. I told her it was totally her decision, which it always is. I just said, "I don't think you have really anything to gain." But in talking to many people that go to prison, having a number is a lot better than not having a number.

. . . .

I mean, there's light at the end of the tunnel.

Q. Okay. But she understood that she was facing—

A. Rest of—mandatory life.

. . . .

And I believe the fear just overcame her of that. And I was surprised that she took it. I've only had one other client accept a deal greater than that, and I still couldn't believe that.

. . . .

Q. Were you aware of the medications that your client was taking: Risperdal and Celexa?

A. I was aware she was taking medications at the time I was appointed. I was told about medications she supposedly did not have at the time of the incident although one witness that was talked to indicated she did have her medications at the time.

Q. Okay. But you were aware that was a possible defense. And in fact, I think I filed a Motion in Limine to keep out her mental health history from the trial. Do you recall that?

A. I don't recall that.

. . . .

I can certainly see why you would have.

Q.  Do you have any reason, as you sit here today, to think that she would have been acquitted if you had raised an insanity defense?

A.  No.

Q.  Do you know of any expert testimony that could have assisted you with putting forth that defense?

A.  No.

. . . .

BY THE COURT:  Well, let me ask you, Mr. Cummings.  If I understand what you're saying, and I know it's been a long time.  Hard to remember what happened.

But in terms of a possible insanity defense, you considered it, but you looked at the probable cause affidavit, the witnesses' accounts of what happened, which described behavior on the part of Ms. Bryant that was not consistent with somebody who was insane, more of a calculating, deliberate plan in terms of going to get the weapon and coming back and that sort of thing?

A.  Yes.  And then she stood over the body and threatened other people if they wanted to come and help the person that was bleeding to death.

(Ex. C1 at 65–74).

At the conclusion of the evidentiary hearing, the circuit court announced its

ruling:

THE COURT:  . . . I'm going to deny your motion, and it's sort of a lot for the reasons I said earlier on when I told you there's a difference between having mental illness and being legally insane. What I would need is somebody who would have—a doctor or psychologist who would have come in and said, no, I think this was a

very viable defense.  I don't have that, and it sounds like your lawyer made a—I guess a strategic decisions [sic] to—

. . . .

The fact of it is the—all of the information in front of him suggested that you weren't, and apparently you were also seen by somebody who said you were competent to proceed.  But.

I assume you're probably right.  Maybe you weren't taking your medications which can have a detrimental effect on you, but you haven't shown me—your burden has not been met to show that this was a viable defense and that he would have been ineffective for not raising it.  So—and the other reasons that I said in the order.

(Ex. C1 at 74–75).  The order to which the court referred was the court's previous order denying Petitioner's other three IATC claims, on the ground that Petitioner failed to satisfy the *Strickland* standard (*see* Ex. C1 at 21–23).

Petitioner presented argument on Ground Three on appeal to the First DCA (Ex. C2).  As previously noted, the First DCA affirmed the circuit court's decision without written opinion (Ex. C4).

The First DCA reasonably rejected Petitioner's argument that Attorney Cummings' was ineffective for failing to investigate an insanity defense and inform Petitioner that her mental disorders provided a viable defense.  The Florida statue authorizing an insanity defense provides:

(1)  Affirmative defense.—All persons are presumed to be sane. It is an affirmative defense to a criminal prosecution that, at the time of the commission of the acts constituting the offense, the defendant was insane.  Insanity is established when:

(a)  The defendant had a mental infirmity, disease, or defect; and

(b)  Because of this condition, the defendant:

1.  Did not know what he or she was doing or its consequences; or

2.  Although the defendant knew what he or she was doing and its consequences, the defendant did not know that what he or she was doing was wrong.

Mental infirmity, disease, or defect does not constitute a defense of insanity except as provided in this subsection.

(2)  Burden of proof.—The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

Fla. Stat. § 775.027.

As the Florida statute provides, mental disease by itself does not constitute a defense of insanity; therefore, the fact that Petitioner was diagnosed with schizophrenia and bi-polar disorder did not, by itself, support an insanity defense. Additionally, neither Petitioner's testimony at the post-conviction evidentiary hearing regarding her killing of the victim, nor Attorney Cummings' testimony regarding the evidence of the killing and Petitioner's statements during their discussions of the case, suggested that Petitioner did not know what she was doing or its consequences, or that she did not know that what she was doing was wrong. The evidence simply suggests that Petitioner believed she was justified in killing her

allegedly abusive boyfriend (and likely under the influence of alcohol, marijuana, and/or crack cocaine), and that she fabricated symptoms of mental illness (in her interview with police, her letters to family members, and her early discussions with Attorney Cummings) to "help herself out."  The state court reasonably concluded that Attorney Cummings made a reasonable, strategic decision that insanity was not a viable defense; therefore, Cummings was not ineffective for failing to inform Petitioner that she had a viable insanity defense.[7]

To summarize, Petitioner failed to demonstrate that the state court's adjudication of Ground One or Ground Three was based upon an unreasonable determination of the facts in light of the evidence presented to the state court, or that its adjudication of either claim was contrary to or an unreasonable application of *Strickland*.  Therefore, Petitioner is not entitled to federal habeas relief on Ground One or Ground Three.

> B.    Ground Two:    "Petitioner's 6th and 14th U.S. Constitutional Amendment rights [sic] were violated where counsel failed to disqualify judge [sic]."
>
> Ground Four:  "Counsel was ineffective for failing to adequately inform Petitioner of plea agreement, thus denying her 6th U.S. Constitutional Amendment right [sic]."

---

[7] Petitioner's voluntary intoxication would not have supported an insanity defense.  *See* Fla. Stat. § 775.051 (effective Oct. 1, 1999).

Case No.:  4:17cv427/WS/EMT

In Ground Two, Petitioner contends Attorney Cummings should have filed a motion to disqualify the trial judge, on the ground that the court displayed partiality when chastising Petitioner for stating that the victim abused her, and then apologizing to the victim's family (ECF No. 1 at 7).  In Ground Four, Petitioner contends Attorney Cummings erroneously advised her that the plea agreement called for a sentence her "up to" 45 years, thus leaving open the possibility of a sentence less than 45 years (*id.* at 10).

Respondent asserts an exhaustion defense as to both of these claims (ECF No. .25 at 7–9, 11–13, 28, 41).  Respondent contends Petitioner presented both claims in her Rule 3.850 motion, but she expressly abandoned them in the post-conviction appeal (*id.*).

The Florida Rules of Appellate Procedure provide that in a case where a movant's Rule 3.850 motion is denied after an evidentiary hearing was held on one or more claims, a movant wishing to appeal the denial of his motion must file an initial brief.  *See* Fla. R. App. P. 9.141(b)(3).  The movant must present argument on all issues for which she seeks appellate review in her initial brief, regardless of whether the claim was summarily denied or litigated at the evidentiary.  *See Kelley v. State*, 109 So. 3d 811, 812 n.1 (Fla. 1st DCA 2013); *Prince v. State*, 40 So. 3d 11

(Fla. 4th DCA 2010); *Pennington v. State*, 34 So. 3d 151, 153 at n.1 (Fla. 1st DCA 2010) (briefing is required in appeal from non-summary denial of Rule 3.850 motion); *Hammond v. State*, 34 So. 3d 58 (Fla. 4th DCA 2010) (claim for which appellant did not present argument, or for which he provided only conclusory argument, was insufficiently presented for appellate review, regardless of whether claim was among those claims litigated at evidentiary hearing or among those claims summarily denied by trial court); *Williams v. State*, 24 So. 3d 1252 (Fla. 1st DCA 2009) (where appellant received evidentiary hearing on some of his post-conviction claims and others were summarily denied, appellate court would review only those summarily denied claims which movant argued in appellate brief).

The Florida procedural rule deeming as waived or abandoned those claims for which an appellant has not presented any argument in her initial brief, even when the post-conviction evidentiary hearing was limited in scope to some but not all post-conviction claims and the appellant's insufficiently presented claims were summarily denied by the trial court, is a firmly established and regularly followed procedural rule for purposes of federal habeas. *See, e.g.*, *Granberry v. Tucker*, No. 5:10cv129/RH/EMT, 2012 WL 2891245, at *26 (N.D. Fla. May 4, 2012), *Report and Recommendation Adopted*, 2012 WL 2890780 (N.D. Fla. July 14, 2012) (nonbinding but recognized as persuasive authority); *Daniels v. Tucker*, No.

5:09cv328/RS/EMT, 2011 WL 7153921, at *18 (N.D. Fla. Nov. 22, 2011), *Report and Recommendation Adopted*, 2012 WL 379590 (N.D. Fla. Feb. 3, 2012); *Stoudmire v. Tucker*, No. 3:09cv48/MCR/EMT, 2011 WL 5426239, at *9–11 (N.D. Fla. Aug. 30, 2011), *Report and Recommendation Adopted*, 2011 WL 5442091 (N.D. Fla. Nov. 9, 2011); *Green v. McNeil*, No. 1:09cv204/MMP/GRJ, 2011 WL 2790167, at *7 (N.D. Fla. June 22, 2011), *Report and Recommendation Adopted*, 2011 WL 2790180 (N.D. Fla. July 15, 2011); *Curry v. Buss*, No. 3:08cv539/LAC/EMT, 2011 WL 2174038 (N.D. Fla. Apr. 26, 2011), *Report and Recommendation Adopt*ed, 2011 WL 2149544 (N.D. Fla. June 1, 2011).

Here, Petitioner filed an initial brief in the Rule 3.850 appeal, but she expressly abandoned Grounds Two and Four (*see* Ex. C2), and thus did not properly exhaust them in the state courts. Moreover, Petitioner cannot now take a second appeal from the denial of her Rule 3.850 motion to attempt to successfully exhaust Grounds Two and Four. Therefore, Grounds Two and Four are procedurally defaulted.

Petitioner has not alleged cause for the procedural default, nor has she alleged she is entitled to federal review of Ground Two or Ground Four through any recognized exception to the procedural bar. Therefore, she is not entitled to relief on Grounds Two and Four.

## V.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S.—, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017) (citing *Miller-El*, 537 U.S. at 327). The petitioner here cannot make that showing. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

The clerk of court is directed to substitute Mark S. Inch for Julie Jones as Respondent.

And it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 6th day of June 2019.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>. A copy of objections shall be served upon all other**

parties.    If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.